United States Courts
Southern District of Texas
FILED

MAR 1 1 2005

Michael N. Milby, Clerk of Court

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IGLOO PRODUCTS CORPORATION | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-05-118 |
| | § | |
| GLENN KIESSLING, | § | |
| DAVID C. SPIVEY, | § | |
| and CHOICE TRANSPORT, INC. | § | |
| | § | |
| Defendants | § | JURY REQUESTED |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, IGLOO PRODUCTS CORPORATION, Plaintiff herein, complaining of Defendants as follows:

### I.

### PARTIES

1.      Plaintiff Igloo Products Corporation ("Igloo") is a Delaware Corporation with its principal place of business at 777 Igloo Road, Waller County, Texas 77494.

2.      Defendant Glen Kiessling ("Kiessling") is a natural person who may be served with process at 18507 Quail Brock Drive, Humble, Texas 77346.

3.      Defendant David C. Spivey ("Spivey") is a natural person who may be served with process through his attorney of record, Andrew J. Mytelka, GREER, HERZ & ADAMS, L.L.P., One Moody Plaza, 18th Floor, Galveston, TX 77550, who has already appeared in this case.

1

4.    Defendant Jerry D. Spivey ("Spivey") is a natural person who may be served with process at his residence at 18706 Mountain Spring, Spring 77379.

5.    Defendant Choice Transport, Inc. ("Choice") is a Texas corporation, which may be served with process through their attorney of record, Andrew J. Mytelka, GREER, HERZ & ADAMS, L.L.P., One Moody Plaza, 18th Floor, Galveston, TX 77550, who has already appeared in this case.

## II.

## JURISDICTION AND VENUE

6.    This action arises, in part, under 18 U.S.C. 1964(c) as hereinafter more fully appears. This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. 1367(a).

7.    Venue is proper in this Court under 18 U.S.C. 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this judicial district.

## III.

## FACTS COMMON TO ALL COUNTS

8.    Igloo was founded in Houston, Texas in 1947, and is one of the leading manufacturers of ice chests, beverage coolers and active cooling products. Igloo sells its products throughout the United States as well as worldwide.  Timely shipment of its products from its manufacturing facilities in the Houston area is critical to Igloo's business. Igloo's distribution department is responsible for ensuring that the products timely arrive at their destination at a competitive, and the lowest possible, transportation rate.

2

9.     Kiessling was Igloo's employee. From 1996 to 1998, Kiessling was employed as Traffic Manager for Plaintiff. From 1999 until August 2004, Kiessling was Igloo's Director of Distribution. In this capacity, Kiessling was responsible for the distribution and movement of Igloo's products throughout the world. To move its products, Igloo routinely used transportation brokers as well as direct transport services from motor carriers. Kiessling was responsible for evaluating and selecting both transportation brokers and motor carriers, negotiating rates, reviewing invoices, and authorizing payments to carriers or brokers for transportation services. Kiessling was well aware that his duty to Igloo as its employee in charge of distribution was act in Igloo's best interest and procure reliable transportation services at competitive rates.

10.    In approximately 1999, Kiessling began using Choice, a licensed transportation broker. David C. Spivey is the president and chief executive officer of Choice. Choice is no longer in good standing with the State of Texas. Jerry Spivey was an employee or agent of Choice and signed checks on its behalf. David Spivey, Jerry Spivey and Choice are collectively referred to as the "Choice Defendants." David Spivey was Kiessling's main contact. Prior to 1999, Spivey had been associated with another company that worked with Kiessling.

11.    Choice was supposed to procure carriers at competitive rates to meet Igloo's transportation needs. Choice would receive calls from Kiessling or an employee in his department with a need to move Igloo products, and Choice would then secure an independent carrier to provide the actual transportation service. Choice would establish the carrier's rates with Kiessling's direction and approval. A Houston dispatcher was employed by Choice to meet Igloo's distribution needs. During the scheme described

herein, Igloo was kept in the dark about the nature of the relationship between the Choice Defendants and Kiessling, and was led to believe there was a legitimate, arms-length business relationship in place. However, it was later discovered that Kiessling's secret involvement with Choice even included him having had a role in Choice's hiring and salary decisions for the Houston dispatcher who handled Igloo's business. At Kiessling's direction, Choice was awarded increasing amounts of Igloo's business from 2000 to 2004.

12.     Igloo was invoiced by Choice for the moves it brokered. The invoice included charges for services the carriers allegedly provided and/or procured. Choice was listed as the motor carrier. Choice would roll its broker fee into the invoice as well, although the fee was not disclosed. As Igloo's Director of Distribution, Kiessling was supposed to review invoices and then approve payment of legitimate charges. Choice would in turn remit payment to the carriers. Kiessling was responsible for handling and approving all transportation invoices, including the Choice invoices.

13.     As the result of a tip, Igloo opened an investigation into Kiessling's relationship with Choice in early 2004. Kiessling denied any illegitimate dealings or conflicts of interest. However, Igloo's investigation revealed a pattern of corruption and racketeering between Kiessling and the Choice Defendants, and potentially others doing business with Igloo's Distribution Department. Many of the specific details of Defendants' schemes are wholly within Defendants' knowledge and are the subject of the ongoing investigation and outstanding requests for information as permitted under the Federal Motor Carrier Safety Regulations. Notwithstanding this fact, Igloo can allege the following details.

14.    On the side, the Choice Defendants provided Kiessling with cash, gifts and other items of value.  In return, Kiessling abused his authority and position with Igloo to provide favorable treatment to Choice Defendants.  Specifically, in exchange for the above-described kick-backs, Kiessling awarded an increasing amount of business to Choice and secretly channeled Igloo's transportation business to and through Choice, requiring carriers who wanted to do Igloo's work to go through Choice.  Meanwhile, Choice retained carriers at higher, and possibly above-market, rates; issued charges for unperformed services, knowing and intending that those charges would ultimately be paid by Igloo and received by Choice; and paid Kiessling under the table in exchange for his favorable treatment of Choice.  To carry out this conspiracy, it is believed the Choice Defendants used the U.S. mail in transmitting fraudulent bills; the internet, telephone and cellular services for communications in furtherance of the scheme, and banking services to make, receive, and hide or launder the payments to Kiessling.

**False Charge Scheme**

15.    Igloo believes that part of the secret Kiessling compensation by the Choice Defendants was based on fees for certain moves by certain carriers.  Choice would charge unearned fees and the fees would be passed along to Igloo, where Kiessling would approve them.  For example, from 2002 to 2004, Choice billed for and Kiessling approved charges associated with services by Exel Transport, Inc. ("Exel"), a transportation broker and carrier, of between $138 and $150 per load.  The Choice Defendants did not provide a service for this fee and never disclosed to Igloo that they were charging this fee.  By way of example, on February 17, 2004, Choice billed Mark VII (a/k/a Exel) for $12,840.00, representing Choice's fee of $150 for 81 loads and $138

for 5 others, although Choice did not perform any service warranting these charges. As such, Choice was billing a third-party transportation broker and motor carrier (Exel/Mark VII) for unperformed services on Igloo loads, and the motor carrier in turn invoiced Igloo. Kiessling approved payment of these fees to the carrier (Exel/Mark VII), who in turn remitted the funds to Choice, so that Choice reaped the benefit of the scheme. Choice, in turn, paid Kiessling with cash or directly paid his debts.

16.    The fee to Choice was not disclosed by Exel on its invoices to Plaintiff. From 2002 to 2004, as a result of this scheme, Igloo unknowingly paid over $225,000 to Choice. During staff meetings between 2002 and 2004, Kiessling claimed to Igloo's CEO and CFO that transportation rates were high for reasons other than the additional fees being paid to Choice or his kick-backs, which he of course never disclosed. Igloo has reason to believe that this fraudulent scheme was in place prior to 2002, and that Defendants also sought similar fees from other carriers as a "cost of doing business" with Igloo.

### Bribery Scheme

17.    When confronted in August 2004, Kiessling and David Spivey denied (1) any exchange of money for personal reasons; (2) any gifts, other than lunches, to Kiessling; and (3) any business relationship other than the use of Choice as a transportation broker. However, Plaintiff soon discovered that the Choice Defendants had in fact been paying thousands of dollars on the side for Kiessling's personal benefit. For example:

a. On March 12, 2004, a cashier's check in the amount of $12,500 with Choice Transport as remitter was paid to Excavation Management for clearing 5 acres owned by Glen Kiessling at 755 Smith Road, Huffman, TX; and

b. On October 4, 2003, Jerry D. Spivey signed a check from Choice Transport, Inc.'s Compass Bank Account, in the amount of $3,000, which was paid to Wyndham-



Greenspoint Hotel for the "Kiessling Surprise Party." Not surprisingly, hotel documents show the event planner as none other than Glen Kiessling;

18.    Kiessling was observed to receive cash payments from David Spivey. No aspect of Kiessling's employment with Igloo included receipt of cash payments directly to Kiessling. It is believed that Kiessling has gone to great lengths to hide and launder cash payments from the Choice Defendants. He often paid his bills and bought personal items with cash. At least between 2001 and 2004, large sums of cash or money orders were used to pay off Kiessling debts or purchase property, including for airline tickets and travel; the cash purchase of a five acre tract in Huffman, Texas; the Wyndham-Greenspoint Hotel deposit; car maintenance; the payoff of Kiessling's motorcycle note; and the payoff of Kiessling credit cards debt in excess of $18,000. Upon information and belief, Kiessling used Igloo resources, such as Federal Express accounts, to pay his personal debts with the proceeds received from the scheme.

19.    Further, Kiessling's standard of living appeared to dramatically increase during his tenure as Director of Distribution, including the purchase of numerous automobiles, trucks, and motorcycles.

### Scheme to Channel Business To and Through Choice

20.    In exchange for the bribes received from the Choice Defendants, Kiessling gave Choice favorable treatment. Kiessling gave Choice an increasing share in Igloo's transportation business, instructed carriers wanting Igloo's work to go through Choice, approved Igloo's payment of money to Choice for services not performed and approved Igloo's payment of excessive fees. In sum, the Choice Defendants' business increased as a consequence of their illegal and secret agreements with Kiessling.

### Igloo's Damages

21.    Due to the Defendants' scheme and conspiracy to commit wrongful acts herein described, Igloo has parted with substantial sums it would not have paid for legitimate transportation services.  Further, Defendants' wrongful conduct deprived Igloo of the opportunity to freely and competitively negotiate contracts and transact business.  It is possible that Igloo's fraudulently elevated transportation costs may have affected its competitiveness in the marketplace and potentially harmed sales.  Damages to Igloo are well in excess of $250,000 and may amount to millions of dollars annually, for the years Kiessling was conspiring with Choice and approving payments by Igloo in exchange for bribes.

## IV.

## CAUSES OF ACTION

**Count 1:    Breach of Fiduciary Duty**

22.    Igloo re-alleges as if fully set forth the allegations set forth in the preceding paragraphs.

23.    Kiessling owed Igloo a fiduciary duty.  He was employed and trusted as a high-level employee of Igloo at the time he accepted cash, gratuities and other items of value from Choice defendants.  Kiessling agreed as condition of employment not to engage in any conduct that could create an actual or potential conflict of interest.  He was advised and understood that an actual or potential conflict occurs when an associate is in a position to influence a decision that may result in personal gain for that associate or a relative as a result of Igloo's business dealings.

24.    As Igloo's employee and fiduciary, Kiessling utterly failed to act in Igloo's best interest.  He failed to act in good faith;  failed to make full and fair disclosures;  failed to

refrain from self-dealing; failed in his duty of loyalty; and failed to provide complete and truthful information to Igloo. Kiessling's dealings with Choice, and possibly other carriers and brokers, were motivated by his own self-interest and greed. He capitalized on his position and hid material information from Igloo, instead only providing Igloo with false, misleading and incomplete information in connection with retention of carriers and his relationship with the Choice Defendants.

25.     Kiessling's failures to comply with his fiduciary duty directly and proximately caused Igloo damages as set forth in paragraph 21. Igloo would show that Kiessling acted with a specific intent to injure Igloo and enrich himself, and therefore Igloo is entitled to exemplary damages.

26.     In addition to actual and exemplary damages, Igloo is entitled to an accounting by Kiessling with respect to all compensation received by Kiessling related to the distribution of plaintiff's products. Without such accounting, Igloo has no adequate remedy at law.

**Count 2:     Conspiracy to Breach Fiduciary Duty**

27.     Igloo re-alleges as if fully set forth the allegations set forth in the preceding paragraphs.

28.     The Choice Defendants and Kiessling had knowledge of, agreed to and intended a common objective and course of action. Specifically, with the objective of maintaining a secret agreement to pay Kiessling on the side in exchange for favorable treatment, the Defendants acted with a specific intent to further, aid and abet Kiessling's breach of fiduciary duty.

29.     The Choice Defendants knew or should have known that their role was part of an overall and ongoing illegal and/or tortious activity.

30.     The Choice Defendants' and Kiessling's conspiracy to breach Kiessling's fiduciary duty directly and proximately caused Igloo damages as set forth in paragraph 21.  Igloo would show that the Defendants collectively acted with a specific intent to injure Igloo and enrich themselves, and therefore Igloo is entitled to exemplary damages.

32.     In addition to actual damages, Igloo is entitled to accounting by Defendants with respect to all compensation received by Defendants related to the distribution of plaintiff's products.  Without such accounting, Igloo has no adequate remedy at law.

**Count 3:      Fraud by Kiessling**

31.     Igloo re-alleges as if fully set forth the allegations set forth in the preceding paragraphs.

32.     Kiessling owed a duty to disclose all material facts to Igloo, and did not.  Among other things, Kiessling failed to disclose his secret agreement with and secret payments from Choice;  he also failed to disclose that he was approving the payment by Igloo of above-market rates and fees for services not performed in order to further his own agenda.

33.     Kiessling failed to disclose material facts concerning Kiessling's relationship with Choice, including, but not limited to:

     a.     From at least 2002 onward, Kiessling used Choice as a "gatekeeper" for motor carriers desiring Igloo's business;

     b.     Choice charged, Kiessling knowingly approved, and Igloo paid inflated rates and excess charges from at least 2002 to 2004;

     c.     Choice demanded payment from carriers, including Exel, for unperformed services on each and every Exel-Igloo load from at least 2001 to 2004;

these charges were passed along to Igloo and knowingly approved by Kiessling;

d.    Kiessling received money and/or benefits from Choice on the side from at least 2003 to 2004, including specifically on March 12, 2004, a cashier's check in the amount of $12,500 from Choice to Excavation Management for clearing 5 acres owned by Glen Kiessling at 755 Smith Road, Huffman, TX; and on October 4, 2003, Jerry D. Spivey signed a check from Choice Transport, Inc.'s Compass Bank Account, in the amount of $3,000, which was paid to Wyndham-Greenspoint Hotel for the "Kiessling Surprise Party."

34.    Furthermore, Kiessling made material false representations from at least 2003 and 2004 to senior management at Igloo that he was negotiating and procuring the best possible rates for the services performed and provided various false and/or misleading reasons as to why charges were high other than his scheme with the Choice Defendants.

35.    By his material misrepresentations and failures to disclose, Kiessling acted with the intent to deceive his employer, Igloo, and cause Igloo to act to its detriment. Kiessling was aware that Igloo did not know of his secret relationship with Choice. Kiessling's misrepresentations and failures to disclose were intended to and did cause Igloo to continue to allow Kiessling to deal with Choice, overpay Choice, and pay Choice for unperformed services, and ultimately to enrich Kiessling personally. Igloo reasonably relied upon Kiessling's representations and omissions to its detriment. Specifically, had Igloo been aware of the facts described to have been distorted and concealed by Kiessling, Igloo's relationship with Choice would have been terminated, Kiessling would have been terminated, and Kiessling's flow of illicit cash from Choice would have come to a stop.

36.    Kiessling's fraud, herein described, directly and proximately caused Igloo damages as set forth in paragraph 21. Igloo would show that the Defendants collectively

11

acted with a specific intent to injure Igloo and enrich themselves, and therefore Igloo is entitled to exemplary damages.

**Count 4:    Conspiracy to Defraud**

37.    The Choice Defendants and Kiessling had knowledge of, agreed to and intended a common objective and course of action. Specifically, with the objective of maintaining a secret agreement to pay Kiessling on the side in exchange for favorable treatment, the Defendants acted with a specific intent to further, aid and abet Kiessling's misrepresentations and failures to disclose. Choice and Spivey secretly paid Kiessling or Kiessling's bills with cash and cashier's checks and hid the truth when confronted by Igloo. The Choice Defendants did not disclose their fraudulent charges to third parties which were passed along to Igloo, paid through third parties to Choice, and which undoubtedly ultimately padded Kiessling's pockets. The Choice Defendants did not disclose their agreement with Kiessling to restrict free trade and channel business through Choice.

38.    The Choice Defendants agreed to and carried out this scheme to have Kiessling defraud Igloo for their mutual benefit, and without Igloo's knowledge or consent.

39.    The Choice Defendants and Kiessling's conspiracy to defraud, herein described, directly and proximately caused Igloo damages as set forth in paragraph 21. Igloo would show that the Defendants collectively acted with a specific intent to injure Igloo and enrich themselves, and therefore Igloo is entitled to exemplary damages.

**Count 5:    Violation of the Texas Free Enterprise Act and Conspiracy to Violate the Texas Free Enterprise Act**

40.    Igloo re-alleges as if fully set forth the allegations set forth in the preceding paragraphs.

41.    In exchange for the secret bribes received from the Choice Defendants, Kiessling provided favorable treatment to the Choice Defendants, as set forth herein. Defendants agreed to and carried out this scheme for their mutual benefit, and without Igloo's knowledge or consent.    Igloo's business was directed to Choice not on the basis of market factors, but because Kiessling was personally enriched.  he Choice Defendants and Kiessling had knowledge of, agreed to and intended a common objective and course of action, namely, to cause Igloo to channel business to Choice in order to enrich the Defendants.

42.    The agreement, conspiracy and combination as alleged in the preceding paragraphs constitute a restraint of trade and conspiracy in restraint of trade or commerce in violation of § 15.05 of the Texas Business and Commerce Code ("The Texas Free Enterprise Act").

43.    The Choice Defendants and Kiessling's conspiracy to defraud, herein described, directly and proximately caused Igloo damages as set forth in paragraph 21. Igloo would show that the Defendants collectively acted with a specific intent to injure Igloo and enrich themselves, and therefore Igloo is entitled to exemplary damages.

**Count 6:    Violations of the Texas Theft Liability Act and Conspiracy to Violate the Texas Theft Liability Act**

44.    Igloo re-alleges as if fully set forth the allegations set forth in the preceding paragraphs.

45.    In exchange for the bribes received from the Choice Defendants, Kiessling provided favorable treatment to Choice Defendants, including but not limited to knowingly authorizing payment by Igloo of money for services not performed, excessive fees for services allegedly performed, and awarding an increasing amount of work to

13

Choice Defendants.  Because Igloo was kept in the dark about the side agreements between the Choice Defendants and Kiessling, it did not effectively consent to payment of these charges.   Defendants acted with the specific intent to deprive Igloo of money without its effective consent.   The Choice Defendants and Kiessling had knowledge of, agreed to and intended a common objective and course of action, namely, to deprive Igloo of funds by overcharges and false charges, and to kick back bribes to Kiessling. These actions constitute a violation of and a conspiracy to violate the Texas Theft Liability Act, Tex. C. Prac. & Rem. C. § 134.001 et seq.

46.     The Choice Defendants and Kiessling's violations of the Texas Theft Liability Act directly and proximately caused Igloo damages as set forth in paragraph 21. Igloo would show that the Defendants collectively acted with a specific intent to injure Igloo and enrich themselves, and therefore Igloo is entitled to exemplary damages.

**Count 7:     Violations of the Racketeer Influenced and Corrupt Organizations Act (RICO),   18 U.S.C.A. §§ 1961 et seq.**

47.     Igloo re-alleges as if fully set forth the allegations set forth in the preceding paragraphs.

48.     From 1999 through August 2004, when Kiessling was terminated by Igloo, the Defendants knowingly conspired to pay Kiessling  kickbacks or bribes to Kiessling in exchange for favorable treatment by Kiessling of Choice.   The scheme included an arrangement whereby Choice billed for and Kiessling caused Igloo to unknowingly pay higher rates and fees for services Choice never performed.   The Defendants acted to promote their own personal gain and in restraint of free trade. These acts and omissions -- collectively, the "Illegal Scheme" -- constituted a pattern of racketeering activity.

14

Specifically, by using the U.S. mail to fraudulently overcharge and facilitate the payment of kickbacks to Kiessling, as well as to conceal information from Igloo which Defendants knew would cause Igloo to change its business conduct, the Choice Defendants and Kiessling committed mail fraud under 18 U.S.C.A. 1341. Defendants utilized interstate wires to carry out their scheme, in violation of 18 U.S.C.A. 1343. Further, Choice's payment of secret kickbacks to Kiessling, a fiduciary for Igloo, without Igloo's knowledge constituted commercial bribery, pursuant to Tex. Penal Code §32.43. Further, the Defendants' actions which caused Igloo to pay money for excessive and false charges for unperformed services constituted theft, pursuant to Tex. Penal Code §31.03. Further, the monies paid to Choice Defendants by Igloo for excessive and false charges, and the monies kicked back to Kiessling by Choice Defendants constitute criminal proceeds, which the Choice Defendants and Kiessling acquired, maintained, received, concealed, possessed, transferred, invested, expended or received, in violation of Tex. Penal Code §34.02.

49.    The Choice Defendants, and/or the Choice Defendants together with Kiessling constitute a group of persons or entities associated for a common purpose – the provision of transportation services to Igloo. Defendants conducted the enterprise's affairs through a pattern of racketeering, namely, through the illegal predicate acts described in the immediately preceding paragraph. The enterprise was separate and distinct from the series of racketeering acts herein described.  Between at least 2001 and 2004, the enterprise was an ongoing organization which engaged in and whose activities affected interstate commerce.  Defendants used and/or invested income derived from the pattern of racketeering and illegal acts, or from the collection of the unlawful debts, in the

establishment and/or operation of the enterprise, which was involved in and affected interstate commerce. Through the enterprise, Defendants engage in consensual decision-making regarding the implementation of their fraudulent scheme and functioned as a continuing unit for the common purpose of executing the Illegal Scheme. While Choice, David Spivey, Jerry Spivey, and Kiessling participated in and were members of the enterprise, each had an existence separate and distinct from the enterprise.

50.    Defendants collaborated and participated in the conduct of, control and operation of the enterprise, including but not limited to the following:

   a.  Billing for and unauthorized payment of fraudulent fees for services not performed;

   b.  Billing for and unauthorized payment of excessive fees;

   c.  Illegally and secretly steering business to Choice; and

   d.   Kicking back money as bribes to Kiessling.

These illegal acts, which constituted racketeering activity, occurred on far more than two occasions over the preceding six years. Specifically, Choice intentionally transmitted false or unwarranted charges for approximately 1,500 loads handled by Exel between 2002 and 2004. Kiessling received illegal bribes from Choice on at least two occasions, specifically on March 12, 2004 (a cashier's check in the amount of $12,500 from Choice to Excavation Management for clearing 5 acres owned by Glen Kiessling at 755 Smith Road, Huffman, TX); and October 4, 2003 (Jerry D. Spivey signed a check from Choice Transport, Inc.'s Compass Bank Account, in the amount of $3,000, which was paid to Wyndham-Greenspoint Hotel for the "Kiessling Surprise Party").

51.    The enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity herein described.

16

52.    Upon information and belief, Defendants carried out the described illegal or racketeering activity by the use of the mails or interstate wires. Defendants' illegal use of interstate mails and wires included the following:

a. Defendants mailed invoices to Igloo that failed to disclose the scheme, and mailed invoices to Exel for unperformed services which were paid for by Igloo and remitted back to Choice;

b. Defendants posted, received and knowingly caused others to post orders, bills of lading, acknowledgements, checks and similar items or received same through the United States Postal Service for the purpose of executing the scheme and artifice;

c. Choice and David Spivey e-mailed Susan Bowles with Exel to confirm payment of the $150 payment on Feb. 12, 2003;

d. To execute and attempting to execute the aforesaid schemes to defraud, Defendants made interstate telephone calls and other uses of interstate wire facilities to and from this district. The use of wires include, but are not limited to interstate telephone calls to Igloo and motor carriers to arrange for the shipment of goods and payment of invoices;

e. Under information and belief, the Choice Defendants faxed Choice invoices to Exel for collection of bribes;

f. Igloo wired money on several occasions to a third party freight auditor for payment of Choice Invoices.

53.    Defendants engaged in money laundering as follows:

a. by acquiring or maintaining an interest in, receiving, concealing, possessing, transferring, and transporting the proceeds of criminal activity. For example, Kiessling accepted cash from Spivey in 2001/2002, Choice defendants paid various debts of Kiessling, including excavation of property in February 2004, and Choice defendants invoiced and received the illegal $150.00 from Exel, including the Choice invoice of Feb. 17, 2004, for $12,840.00;

b. by conducting, supervising, or facilitating a transaction involving the proceeds

of criminal activity.  For example, Defendants directed Exel to remit $150.00 per load despite no services being performed to justify the fee.  Choice confirmed the required fee in an e-mail dated February 14, 2003 to Susan Bowles at Exel.

c.  by investing, expending, or receiving, or offering to invest, expend, or receive, the proceeds of criminal activity or funds that the person believes are the proceeds of criminal activity.  Kiessling used money received from Choice to pay personal debts on various occasions, including money orders used to pay off a motorcycle note.  Choice Defendants used money received from the scheme to pay Kiessling's personal debts, including excavation of property on March 12, 2004 and a hotel deposit on October 4, 2003.

54.    The scheme of racketeering activity described herein was designed to, and did, cause Igloo to pay more than they otherwise would have for transportation services, to forego other business relationships, and to favor Choice when they would not have otherwise.

55.    Defendants have not undertaken the practices described herein in isolation, but instead have done so as part of a common scheme and conspiracy.  Each member of the conspiracy intentionally and knowingly agreed to, and committed acts in furtherance of, the common goal of the conspiracy, which was to bribe Kiessling in order to accomplish favorable treatment and excessive payments by Igloo to Choice.

56.    The Choice Defendants and Kiessling's RICO violations and conspiracy to violate RICO, herein described, directly and proximately caused Igloo damages as set forth in paragraph 21. Igloo would show that the Defendants collectively acted with a specific intent to injure Igloo and enrich themselves, and therefore Igloo is entitled to exemplary

damages.

57.    Under 18 U.S.C. §1964(c), Igloo is entitled to bring this action and recover treble damages, the costs of bringing this suit and reasonable attorney's fees.

**Count 9:  Unjust Enrichment and Constructive Trust**

58.    Igloo re-alleges as if fully set forth the allegations set forth in the preceding paragraphs.

59.    In exchange for the bribes from the Choice Defendants, Kiessling steered Igloo's business to Choice, paid Igloo's money for excessive fees and unearned fees, all without Igloo's consent.   Defendants are unjustly enriched by virtue of the bribe money and money received by the Choice Defendants as a result of this illegal scheme.

60.    In the alternatively to its request for legal remedies, a constructive trust should be established over funds received by Defendants related to transportation of Igloo products.

**Count 10:    Conspiracy to Commit Commercial Bribery**

61.    Igloo re-alleges as if fully set forth the allegations set forth in the preceding paragraphs.

62.    Defendants conspired to violate and did violate the commercial bribery provision of the Texas Penal Code, § 32.43. Kiessling, as an employee and fiduciary, without Igloo's consent, intentionally and/or knowingly solicited, accepted, or agreed to accept benefits with the agreement and/or understanding that those benefits would influence Kiessling's conduct on behalf of Igloo. Specifically, in exchange for bribes from the Choice Defendants, Kiessling steered Igloo's business to Choice, paid Igloo's money for excessive fees and unearned fees, all without Igloo's consent.

63.    The Choice Defendants are likewise liable for commercial bribery, in that they

agreed to and did remit money and benefits, as described in the immediately preceding paragraph, to Kiessling.

64.    The Choice Defendants and Kiessling's commercial bribery scheme, herein described, directly and proximately caused Igloo damages as set forth in paragraph 21. Igloo would show that the Defendants collectively acted with a specific intent to injure Igloo and enrich themselves, and therefore Igloo is entitled to exemplary damages.

**Count 11:    Violation of Federal Motor Carrier Safety Regulations**

65.    Igloo re-alleges as if fully set forth the allegations set forth in the preceding paragraphs.

66.    The Choice Defendants generated bills which wrongfully included charges for services not performed. These bills or charges were sent to Exel with Choice's expectation and intent that the bills or charges were be billed by Exel to Igloo. In fact, the false bills or charges from Choice were passed through to Igloo, approved by Kiessling, and paid by Igloo. Consequently, Choice violated 49 U.S.C §13708 and 49 USC § 14704, by having a motor carrier, i.e. Exel, present false or misleading information on a document about the actual rate, charge, or allowance to Choice, a party to the transaction.

**V.**

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs respectfully request this Court enter a judgment:

    a.    Retaining jurisdiction over this action to insure full compliance with the Orders of the Court and with applicable law and to require Defendants to file such reports as the Court deems necessary to evaluate compliance;

    b.    Order an accounting by each Defendant with respect to all compensation received by Defendants related to the distribution of Plaintiff's products;

c.      That the Court adjudge and decree that each of the Defendants have engaged in the unlawful activities alleged in the various counts of this Complaint;

d.      Direct Defendants, jointly and severally, to pay the amount of damages actually suffered by Plaintiff as proved at trial;

e.      Order disgorgement and/or impose a constructive trust upon Defendants' ill-gotten monies;

f.      That the Court order the Defendants to pay threefold the damages determined to have been sustained by virtue of the alleged violations of the United States RICO laws, and that joint and several judgments be entered against each of the Defendants for the amounts determined;

g.      Direct Defendants to pay Plaintiff punitive or exemplary damages for their extreme, outrageous, wrongful, intentional, and malicious conduct;

h.      Award Plaintiff the costs of this action together with reasonable and necessary attorney fees under the Texas Theft Liability Act for trial preparation, trial, post judgment procedures, and appeal as this Court deems necessary and proper; and

i.      Prejudgment and post-judgment interest at the maximum rate allowed by law.


Respectfully submitted,

FRANKLIN, CARDWELL & JONES,
A Professional Corporation

By: _____

Sheila M. Wollam –Attorney in Charge
State Bar No. 00788099
J. Randolph Ewing
State Bar No. 06755400
1001 McKinney, 18th Floor
Houston, Texas 77002
(713) 222-6025 Telephone
(713) 222-0938 Telecopier
Email: attorneys@fcj.com

**ATTORNEYS FOR PLAINTIFF**